# UNITED STATES DISTRICT COURT

**FILED**
DISTRICT COURT OF GUAM
APR 0 7 2008
JEANNE G. QUINATA
Clerk of Court

FOR THE _____ DISTRICT OF ____GUAM____

In the Matter of the Search of
(Name, address or brief description of person, property or premises to be searched)
Electronic devices seized from Ernesto Paglicawan Verdera
on February 28, 2008
(Further Described in Attachment A)

APPLICATION AND AFFIDAVIT
FOR SEARCH WARRANT

Case Number: ~~08-00018~~
4/7/08
MJ-08-00003

I, Peter F. Ungacta _____ being duly sworn depose and say:

I am a(n) Task Force Agent, U.S. Immigration and Customs Enforcement _____ and have reason to believe
Official Title

that ☐ on the person of or ☑ on the property or premises known as (name, description and/or location)
The Evidence Room of the U.S. Immigration & Enforcement RAC/Guam in the First Hawaiian Bank Building, Suite 401, 400 Route 8, Mongmong, Guam

in the _____ District of ____Guam____

there is now concealed a certain person or property, namely (describe the person or property to be seized)
see Attachment A which is incorporated herein,

which is (state one or more bases for search and seizure set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)
property that constitutes evidence of the commission of a criminal offense; contraband and fruits of crime, and property designed and intended for use as a means of committing a criminal offense,

concerning a violation of Title __18__ United States code, Section(s) Section 371; Title 31, U.S.C. Sections 5316, 5317, 5322 and 5332

The facts to support a finding of probable cause are as follows:
See attached Affidavit which is incorporated herein.

Continued on the attached sheet and made a part hereof: ☑ Yes ☐ No

_____
Signature of Affiant

Sworn to before me and subscribed in my presence,

4/7/2008 3:25 pm at Hagatna, Guam
Date                                    City                    State

JOAQUIN V.E. MANIBUSAN, JR.  Magistrate Judge
Name of Judge              Title of Judge          Signature of Judge

ORIGINAL

# APPLICATION AND AFFIDAVIT FOR SEARCH WARRANT

## INTRODUCTION

1. I, Peter Flores Ungacta Jr., your affiant, am currently employed as a Customs Officer for the Customs and Quarantine Agency (CQA), Government of Guam, and have been so employed for approximately 4 years. I am currently assigned to the United States Immigration and Customs Enforcement (ICE) Task Force in Guam. Previously, I was assigned to the Office of Intelligence as an intelligence officer with the CQA for about 2 years and 3 months.

2. I am a graduate of the Basic Law Enforcement Academy, Cycle 11, at the Guam Community College. I am a graduate of the CQA Recruit Academy, Cycle 3, which covered both Guam and federal customs authority. As a uniformed customs officer, I participated in "Operation Firewall", an outbound currency interdiction operation, led by the U.S. Customs and Border Protection. As an ICE Task Force Agent, I have participated in numerous outbound currency interdiction operations.

3. Based on my knowledge, training and experience, including the experience of other agents with whom I have spoken to, I am aware that illegal drugs, including methamphetamine, are smuggled into Guam and that the cash proceeds generated from the sale of these illegal drugs are then laundered or smuggled in bulk out of the United States to foreign destinations to conceal their illegal source. I am also aware that bulk cash generated from other non-drug related illegal activity in Guam is smuggled out of the United States so that the money can be laundered and its illegal source concealed.

4. I have participated in investigations involving the smuggling of bulk cash and failure to file Currency and Monetary Instrument Reports when crossing the United States border. I have also participated in numerous searches of vehicles, residences and businesses of suspected drug traffickers for controlled substances and other evidence of drug trafficking and money laundering. These investigations have included airport drug investigations involving the search of hand carried articles, baggage and the persons of suspected drug couriers for controlled substances, concealed cash and other drug-related evidence.

5. I have spoken with numerous ICE and Drug Enforcement Administration Special Agents and Guam Customs officers who have extensive experience in financial and narcotics investigations and have shared with me the substance of their experiences and the results of their own investigations and interviews. As a result of my experiences, I am familiar with how narcotics operations and other illegal activity generate bulk cash proceeds to be laundered or smuggled out of the United States. I am familiar with various methods used by smugglers and traffickers to transport controlled substances and cash through airports and seaports by courier and in checked baggage.

1

6. Based on my knowledge, training, and experience, including the experience of other agents with whom I have spoken to, I am aware that criminals often use email and cell phones to communicate instructions, plans and intentions to their criminal associates and to report on the progress of their criminal activities. I am aware that evidence of these instructions, plans, intentions, reports and general discussions of criminal activity remain inside cell phones, computers, subscriber identity module (SIM) cards, flash drives (also known as thumb drives) and other electronic data storage devices in the form of personal email, instant messages (IM), text messages, notes, records, phone numbers, incoming and outgoing call histories, photographs, address books, other data entries and records, internet search histories, cache files, temporary internet files, cookies and log files.

7. Based on my knowledge, training, and experience, including the experience of other agents with whom I have spoken to, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. When a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space - that is, in space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space - for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

8. Based on my knowledge, training, and experience, including the experience of other agents with whom I have spoken to, and others involved in the forensic examination of computers, I know the following:

(a) Searching computer systems is a highly technical process which requires specific expertise and specialized equipment. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application or operating system that is being searched.

(b) Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden,"

2

erased, compressed, encrypted or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted.

9. Based on my knowledge, training and experience, I am aware that U.S. Immigration and Customs Enforcement has the authority to enforce the provisions of Title 18, U.S.C. Section 371, and Title 31, U.S.C. Sections 5316, 5317, 5322, and 5332; and I am aware that for purposes of enforcing Title 31, U.S.C. Section 5316, the term "United States" includes the Territory of Guam.

10. I make this affidavit, in part, on personal knowledge derived from my participation in this investigation and, in part, upon information and belief. The sources of my information and belief are oral and written reports about this and other investigations which I have received, directly or indirectly, from agents of the ICE and Guam Customs officers and observations and discoveries by ICE agents and Guam Customs officers which have been reported to me either directly or indirectly and debriefings of witnesses and sources of information. In my affidavit, I have not included every fact known to me concerning this investigation. Rather, I have set forth sufficient facts to establish probable cause for a warrant authorizing the search of certain electronic devices. Furthermore, ICE/SAC-Chicago, Cyber Crimes Unit have been contacted and they have agreed to conduct the forensic examination of the electronic devices on behalf of ICE/RAC-Guam.

## PURPOSE

11. This affidavit is made in support of an application for a warrant to search a laptop computer, cell phone, Subscriber Identity Module (SIM) card, and six thumb-drives that are currently held as evidence by ICE RAC/Guam. These items were seized from Mark Anthony BARTOLOME by ICE RAC/Guam agents on February 28, 2008 at the Guam International Airport pursuant to an outbound currency search and examination of Ernesto Paglicawan VERDERA and Mark BARTOLOME. The outbound currency examination of their baggage and effects resulted in the discovery and seizure of $810,631.00 in undeclared currency that was being smuggled out of the United States. Both VERDERA and BARTOLOME were subsequently arrested and charged with violation of Title 31, U.S.C. Section 5332.

12. Specifically, the electronic devices seized from Mark BARTOLOME on February 28, 2008, now held in evidence by ICE RAC/Guam, are:

3

-Dell Latitude D430 laptop computer with charger
-Nokia Cell Phone with charger, model: 6230, type: RH-12
-Vodafone SIM card, bearing number M 0172
-Green and silver, PNY Technologies thumb-drive, bearing number 511-060302027
-Green and silver, PNY Technologies thumb-drive, bearing number 511-060310033
-Purple and silver, PNY Technologies thumb-drive, bearing number 40056248
-Purple and silver, PNY Technologies thumb-drive, bearing number 40033071
-Red and gray, Imation thumb-drive, bearing number IDBG47A661
-Silver and black, Kingston Data Traveler II thumb-drive, bearing barcode number 05H193

The above-referenced items are currently secured in the Evidence Room of the U.S. Immigration and Customs Enforcement RAC/Guam in the First Hawaiian Bank Building, Suite 401, 400 Route 8, Mongmong, Guam.

## BACKGROUND

13. THUMB-DRIVE or FLASH-DRIVE - A data storage device generally integrated with a USB (universal serial bus) connector and is typically removable, portable and rewritable.

14. SUBSCRIBER IDENTITY MODULE (SIM) – Is part of a removable smart card ICC (Integrated Circuit Card), also known as SIM Cards, for mobile cellular telephony devices such as mobile computers and mobile phones. SIM cards securely store the service-subscriber key (IMSI) used to identify a subscriber. The SIM card allows users to change phones by simply removing the SIM card from one mobile phone and inserting it into another mobile phone or broadband telephony device.

15. COOKIES - A file that is generated by a website when a user on a remote computer accesses it. The cookie is sent to the user's computer and is placed in a directory on that computer, usually labeled "Internet" or "Temporary Internet Files." The cookie includes information such as user preferences, connection information such as time and date of use, records of user activity including files accessed or services used, or account information. The cookie is then accessed by the website on subsequent visits by the user, in order to better serve the user's needs.

16. INSTANT MESSAGING (IM) - IM is a communications service that allows two users to send messages through the Internet to each other in real-time. Users subscribe to a particular messaging service (e.g., AOL Instant Messenger, MSN Messenger) by supplying personal information and choosing a screen-name to use in connection with the

4

supplying personal information and choosing a screen-name to use in connection with the service. When logged in to the IM service, users can search for other users based on the information that other users have supplied, and they can send those users messages or initiate a chat session. Most IM services also allow files to be transferred between users, including music, video files, and computer software. Due to the structure of the Internet, a transmission may be routed through different states and/or countries before it arrives at its final destination, even if the communicating parties are in the same state.

17. LOG FILES - Computer files that contain records about system events and status, the identity and activities of users, and anomalous or unauthorized computer usage. Names for various log files include, but are not limited to: user logs, access logs, audit logs, transactional logs, and apache logs. Logs can also maintain records regarding the identification of users on a network, as well as Internet sites accessed by the computer.

18. CACHE - A temporary storage area where frequently accessed data can be stored for rapid access. Once the data is stored in the cache, future use can be made by accessing the cached copy rather than re-fetching or recomputing the original data, so that the average access time is shorter.

## PROBABLE CAUSE

19. On February 28, 2008, in Guam, Ernesto Paglicawan VERDERA (DOB: 11/04/1954, German passport #520828938) and Mark Anthony BARTOLOME (DOB: 07/20/1978, U.S. passport #094472917) checked into Philippine Airlines flight number 111 at approximately 5:00 a.m. Analysis of their airline reservation shows that they were traveling together. The call back phone number for both reservations was 671-788-3898, each reservation mentioned the other and VERDERA was assigned seat number 4F, and BARTOLOME was assigned seat number 4D.

20. VERDERA checked seven bags, tag numbers 149052, 149053, 149054, 149055, 149056, 149057 and 149058. Subsequent events would reveal that VERDERA retained two hand carried bags. BARTOLOME checked in two bags, tag numbers 149059 and 149060. Subsequent events would reveal that BARTOLOME retained two hand carried bags. All of VERDERA's checked bag tags show sequence #76 and all of BARTOLOME's checked bag tags show sequence #77.

21. At about 5:20 a.m., Lead Transportation Security Officer (LTSO) Tomas Cruz began a routine security inspection of one of the bags checked by VERDERA, #149058, a cardboard Home Depot box. LTSO Cruz was assisted by TSO Maureen Camacho. The supervisor was STSO Rose Pascual.

5

22. The box was heavy and would not fit into TSA's Explosives Detection System (EDS) for screening. While hand searching the box, LTSO Cruz noticed the bottom appeared to be tampered with and reconstructed. LTSO Cruz found an unusual pad-like object wrapped in carbon paper within the reconstructed area. The object consisted of a large amount of U.S. currency wrapped in carbon paper, newspaper and duct tape. TSO Camacho found a similar package also containing a large amount of cash. In addition, Cruz and Camacho found drug paraphernalia in the box. The cash was not counted but placed in TSA trays.

23. Suspecting criminal activity, TSA notified Guam Airport Police and Guam Customs and Quarantine Agency. Guam Customs subsequently notified me and I notified Immigration and Customs Enforcement. VERDERA and BARTOLOME were located in the airport and escorted back to TSA Pod #1. TSA and ASIG ground service personnel retrieved the remaining eight checked bags belonging to VERDERA and BARTOLOME from the flight and brought them to TSA Pod #1.

24. At about 6:40 a.m., at Pod #1, TSA officers turned over VERDERA and BARTOLOME and all of their baggage, including the Home Depot box and contents from the box now contained in TSA trays, to Guam Customs Contraband Enforcement Team (CET) Officer Eugene Igros. VERDERA and BARTOLOME were detained and escorted to the Guam Customs area for further questioning and outbound examination of their bags and persons by ICE agents.

25. At the direction of ICE/RAC Agent Robert Robertson, in the corner of the Customs Arrivals area, all bags and baggage belonging to VERDERA and BARTOLOME were spread out to be searched and inventoried, including the already opened Home Depot box. The ensuing search resulted in the discovery of $810,631.00 in concealed U.S. currency, small amounts of suspected crystal methamphetamine and drug paraphernalia.

26. While ICE agents and Guam Customs officers prepared for a briefing, VERDERA asked ICE Special Agent (SA) Erfel Matanguihan how much money was found. SA Matanguihan said he did not know. VERDERA voluntarily stated to SA Matanguihan there was $700,000.00 to $900,000.00 in his baggage.

27. Prior to ICE arrival, Officer Igros, witnessed by Lt. Glenn Paulino, conducted a pat down and Customs search of BARTOLOME and his carry-on bags. A laptop computer, cell phone, currency, miscellaneous travel documents, identification and other items were found. Officer Brian Galarpe, witnessed by Officer John Roberto, conducted a pat down and Customs search on VERDERA and his carry-on bags. Three cell phones, currency, miscellaneous travel documents, identification and other items were found.

6

28. At about 8:45 a.m., as witnessed by SA Matanguihan, SA Avery Cepeda advised VERDERA, in English, of his constitutional rights using an ICE Miranda Rights form. Not appearing to understand English well, SA Matanguihan proceeded to advise VERDERA of his constitutional rights in the Tagalog language. VERDERA requested an attorney. The interview stopped and no further questions were asked.

29. At about 8:38 a.m., as witnessed by CET Officer Christopher Sablan, TFA Ungacta advised BARTOLOME of his constitutional rights using an ICE Miranda Rights form which BARTOLOME acknowledged by placing his initials after each statement and signing the waiver of rights statement. Shortly thereafter, TFA Ungacta, Officer Sablan, SA Cepeda and SA Matanguihan interviewed BARTOLOME who advised the following:

(a) On February 28, 2008, at about 4:45 a.m., due to an excessive amount of baggage, BARTOLOME dropped VERDERA and all their baggage curbside at the airport departure area then proceeded to return their rental car at Avis in the airport. BARTOLOME and VERDERA checked in at the Philippine Airlines counter at about 5:00 a.m.

(b) While waiting at the gate to board Philippine Airlines flight 111, BARTOLOME and VERDERA were approached by uniformed personnel and escorted to the TSA screening area. Once at the TSA screening area, other uniformed personnel escorted BARTOLOME and VERDERA to the Guam Customs inspection area.

(c) BARTOLOME has known VERDERA for seven years. BARTOLOME refers to VERDERA as "Ernie" or "Kuya" (phonetic), which means "brother" in the Tagalog language.

(d) BARTOLOME has been to Guam a total of three times. All three trips were with VERDERA. On their third and most recent trip, BARTOLOME arrived in Guam from Manila on January 28, 2008 or January 29, 2008. VERDERA arrived in Guam two to three days later to meet BARTOLOME. They shared a rental car and room #309 at Days Inn in Tamuning.

(e) BARTOLOME first visited Guam with VERDERA sometime in December 2007 and stayed for about 2 weeks before returning to Manila, Philippines. VERDERA suggested that he and BARTOLOME travel to Guam for vacation. BARTOLOME did not help VERDERA take money back to Manila on that particular trip and has no idea if VERDERA transported money himself.

(f) BARTOLOME and VERDERA returned a second time to Guam from Manila in early January 2008 and stayed for about 1-1/2 weeks before returning to Manila with an

7

undetermined amount of cash. During their stay in Guam, BARTOLOME and VERDERA visited Saipan for one day of sightseeing and returned to Guam.

(g) BARTOLOME helped VERDERA count and bundle the money in denominations of 10, 20, and 100 bills. BARTOLOME helped to transport the money from Guam to Manila, Philippines on their second and third trip to Guam. VERDERA bought the poster board paper and prepared the flooring of the luggage. Throughout their stay, BARTOLOME witnessed VERDERA packing money under the false flooring of the luggage.

(h) BARTOLOME stated the money belongs to VERDERA. BARTOLOME does not know from whom VERDERA obtained the money while in Guam. BARTOLOME believes the source of the money is drugs but he is not certain. BARTOLOME knew there was over $10,000.00 in the bags and that the money had to be reported. BARTOLOME is on Guam to help VERDERA transport the money. BARTOLOME has been paid $6,000.00 to $7,000.00 for helping VERDERA smuggle bulk cash from Guam to Manila, Philippines. BARTOLOME raised a concern to VERDERA that authorities would catch them smuggling money if the money was concealed in checked baggage as opposed to hand-carrying the money. VERDERA told BARTOLOME they would not get caught.

(i) In the past, BARTOLOME has used cocaine, marijuana and methamphetamine. Currently, BARTOLOME smokes "ice" or methamphetamine about twice a week. BARTOLOME has seen VERDERA use methamphetamine as well. BARTOLOME placed about a gram amount of methamphetamine for personal use in a pink condom box, which he brought to Guam from Manila. BARTOLOME uses aluminum foil to smoke methamphetamine.

(j) BARTOLOME and VERDERA reside in Germany. BARTOLOME is employed as a computer support technician with the United Nations Framework Convention for Climate Change (UNFCC).

30. At about 6:00 p.m., at the ICE office in Sirena Plaza, SA Cepeda and SA Matanguihan resumed the interview of BARTOLOME at which time he stated the following:

(a) BARTOLOME and VERDERA's belongings are mixed together throughout the checked baggage.

(b) BARTOLOME is not aware of VERDERA selling drugs.

(c) The money in the bags belongs to VERDERA.

8

(d) BARTOLOME and VERDERA separate when they arrive in the Philippines. BARTOLOME does not know what VERDERA does with the money.

(e) BARTOLOME used the digital scale found in the checked baggage to weigh the gram of methamphetamine he brought in to Guam from Manila before he smoked it. BARTOLOME later stated he brought in to Guam about a 2-gram amount of methamphetamine, which is located in a pink condom box.

(f) BARTOLOME's purpose is to transport the money from Guam to Manila. For the two trips, BARTOLOME received between $6,000.00 to $7,000.00 plus additional spending money for food and other expenses. Sometimes VERDERA gives BARTOLOME $1,000.00 to $2,000.00 spending money.

(g) BARTOLOME recommended to VERDERA that they carry the money on their persons and in their hand-carry bags instead of checking it in because he felt it was safer. BARTOLOME and VERDERA transported money from Guam to Manila in the same fashion on their second trip.

31. ICE RAC/Guam agents arrested VERDERA and BARTOLOME for violation of Title 31, U.S.C. Section 5332. On March 5, 2008, a Federal Grand Jury indicted VERDERA and BARTOLOME for violations of Title 31, U.S.C. Section 5332. Both VERDERA and BARTOLOME were remanded to the custody of the U.S. Marshals Service pending trial.

32. In the course of searching Mark Bartolome's baggage, effects and person for undeclared currency, ICE agents, assisted by Guam Customs officers discovered the following:

(a) Dell Latitude D430 laptop computer found in BARTOLOME's hand carry bag.
(b) Nokia 6230-cell phone found on BARTOLOME's person.
(c) SIM card found in BARTOLOME's checked baggage.
(d) Miscellaneous thumb drives found in BARTOLOME's hand carry bag.
(e) Drug evidence/paraphernalia and suspected methamphetamine found in BARTOLOME's checked baggage.

## SEALING REQUEST

33. The criminal investigation into the activities of BARTOLOME and VERDERA are continuing and interviews, subpoenas and possibly additional search warrants are contemplated. Disclosure of the contents of this affidavit would seriously impede the continuing investigation by disclosing the nature and scope of the government's investigation, the sources of information, and other critical details. I believe such

9

disclosure would lead to pressure on suspects, their associates and other potential witnesses not to speak with the government investigators, and may lead to the destruction of documents and other evidence, all of which would seriously impede this investigation. It may also lead to pressure on other potential witnesses and the destruction of other documents that would seriously impede any further investigation in Guam and elsewhere.

## CONCLUSION

34. I believe there is probable cause to believe that these items are fruits, evidence, and instrumentalities of criminal offenses against the United States and that they contain stored electronic information that is evidence of violations of Title 18, U.S.C. Section 371, and Title 31, U.S.C. Sections 5316, 5317, 5322, and 5332.

35. I respectfully request that this Court issue a search warrant allowing special agents of the U.S. Immigration and Customs Enforcement, including computer technicians, to conduct a search of the seized items, set forth in line 12 of this affidavit, believed to contain some or all of the evidence described in the warrant.

FURTHER THE AFFIANT SAYETH NAUGHT.

Peter F. Ungacta Jr.
Task Force Agent
U.S. Immigration and Customs Enforcement
Department of Homeland Security


SUBSCRIBED AND SWORN to before me this 7th day of April 2008.

JOAQUIN V.E. MANIBUSAN, JR.
Magistrate Judge
District Court of Guam

10

## "ATTACHMENT A"

The electronic devices seized from Ernesto P. Verdera on February 28, 2008, now held in evidence by ICE RAC/Guam, are:

- Ion, IOGEAR, 2.5" Ion-Drive, external hard-drive, model number GHD225U40
- Ortel Mobile SIM card, bearing number 354H79
- Globe Handy Phone SIM card, bearing label WIBGTC
- Smart Buddy SIM card, bearing number LGS0103
- Nokia cell phone, model: 6230, type: RM-72
- Nokia cell phone, model: N70-1, type: RM-84
- Nokia cell phone, model: 6300, type: RM-217
- Nokia cell phone, model: 6630, type: RM-1

The items referenced above are currently secured in the Evidence Room of the U.S. Immigration & Customs Enforcement RAC/Guam in the First Hawaiian Bank Building, Suite 401, 400 Route 8, Mongmong, Guam.